## BAKER *v.* CUMMINGS.

PARTNERSHIP; EQUITY PRACTICE; ANSWER AS EVIDENCE;
FRAUD; LACHES.

1. In order to maintain a sale of a partnership interest by one partner to another, it must be made to appear, first, that the price paid approximates reasonably near to a fair and adequate consideration for the thing purchased; and, second, that all the information in the possession of the purchaser, which was necessary to enable the seller to form a sound judgment of the value of what he sold, should have been communicated by the purchaser to his copartner.

2. Where a bill in equity expressly waives answer under oath, and the defendant in his sworn answer declines to avail himself of such waiver, the answer, under Equity Rule 63 of the Supreme Court of this District, is not evidence in the defendant's favor unless the cause be set down on bill and answer only.

3. What constitutes laches must depend upon the circumstances of each particular case. A delay of three years by one partner in bringing suit to avoid a sale of a partnership interest on the ground of fraud, *held*, under the circumstances of the case, not to be unreasonable.

4. Where a partner purchases from his copartner a certain partnership interest and pays for it out of the partnership funds less than the amount due him from such funds, the sale is void for want of consideration, and laches is no defence in a suit brought to set aside such sale as fraudulent and for a settlement of the partnership accounts.

No. 339. Submitted June 8, 1894. Decided October 1, 1894.

HEARING on an appeal by the defendant (leave having first been obtained) from an interlocutory decree of the Supreme Court of the District of Columbia, holding an equity term, setting aside as fraudulent an assignment by one partner of his interest in a portion of the partnership business, to his copartner, and directing an accounting between them. *Affirmed.*

STATEMENT OF THE CASE.

The following was the bill of complaint, filed February 1, 1890 :

" The complainant states as follows :

" 1. He is a citizen of the United States, residing in the city of Washington, District of Columbia, and brings this suit in his own right.

" 2. The defendant, Henry M. Baker, is a citizen of the United States, and also resides in Washington aforesaid.

" 3. That the complainant and the defendant have, for more than fifteen years last past, been attorneys at law, and engaged in the general practice of their profession in the various courts of the District of Columbia, and of the United States, as well as before the executive and legislative branches of the Government.

" 4. That on or about the first day of January, 1876, the complainant and defendant entered into an agreement, by parol, to form a copartnership to prosecute the practice of the law, at Washington, aforesaid, under the firm name and style of Cummings and Baker ; said agreement was to the effect that they were thereafter, and until either party should desire to end the partnership relation, jointly to prosecute their profession as attorneys at law as equal partners, each to share equally in all the profits or losses of their joint business, and said partnership continued from thence until about the first day of September, 1889, when it was dissolved by mutual consent.

" 5. That under said partnership relation the complainant and the defendant continued to transact all their legal and professional business upon joint account as such partners, except as hereinafter specially set forth. And the complainant faithfully fulfilled all the obligations of his partnership agreement until the dissolution thereof as aforesaid.

" 6. That among the items of business transacted under the agreement aforesaid were a class of cases which con-

sisted of claims against the United States by inspectors of customs, growing out of a prior improper construction of Sections 2733 and 2738 of the Revised Statutes of the United States by the accounting officers of the Treasury Department. That the course of procedure in the prosecution of the said cases, which for convenience are here called 'Inspectors' cases,' was as follows : A contract was obtained from the claimant, by which the firm of Cummings and Baker agreed to prosecute the claimant's claim upon a contingent fee (in most cases) of twenty-five (25) per centum upon the amount which might be recovered. The claims were then formulated, made up and presented to the accounting officers of the Treasury Department, and if allowed appropriations to pay the same were asked for by the Secretary of the Treasury from the Congress, and when said appropriation was made the claims were then paid by the Treasurer of the United States in the usual way. This partnership business grew to be of considerable magnitude, and as said inspectors' cases were all of similar character, it was deemed convenient in the prosecution of the businsss of the partnership, which embraced other important causes, that this particular class of cases should be placed in the management and control of one of the partners, and (the same being true of other cases, in the division of work in the law office of these parties), the management and control of these ' Inspectors' cases ' passed completely to the care of the defendant Baker, so that for several years prior to the 1st day of September, 1886, the complainant had only a general knowledge of the business being done in said cases, and nearly all the papers and memoranda in relation thereto were in the manual possession of the defendant Baker. And prior to that time a great many of said cases had been prosecuted to final payment, the money received thereon being collected for the most part by the said Baker, and a division of the net avails being had between the parties in accordance with their agreement, at least so far as

the said defendant Baker made return thereof. That on
or before the said first day of September a great many of
said cases had been presented to the accounting officers of
the Treasury, and by those officials duly allowed, and ap-
propriations by Congress had been made therefor, and said
Baker was then engaged in the collection of the amounts
due thereon. And the complainant states that the defend-
ant Baker had full knowledge of all the details of said busi-
ness, and particularly well knew and understood what of
said inspectors' cases had passed to such congressional ap-
propriation, and also well knew that the complainant did
not know what the amount of such allowance for said cases
was. In addition to the said cases, in which the fees of the
copartnership had been fully earned as aforesaid, there were
other of said cases in the office, as to which no appropria-
tion had been made by Congress, but which were still pend-
ing and awaiting allowance or appropriation; and also there
were many other of said cases, the prosecution of which the
firm had taken measures to secure by contract with the
claimants, and which were in fact secured by the defendant,
as hereinafter set forth. Of all of these matters the said
defendant alone had full and complete knowledge and in-
formation; the said defendant, on or about the 6th day of
September, 1886, approached the complainant and requested
complainant to sell out or assign to him, for the sum of
fifteen thousand dollars, complainant's interest in the fees
earned in those cases where an appropriation had been
made, and also in those cases where contracts had been ob-
tained from the claimants, and in which no appropriation
had been made, and also those claims, contracts for the
prosecution of which it was expected would be secured by
the said firm, and thereupon various conversations were had,
on divers occasions, about that time, in regard to the pro-
posed purchase of complainant's said interests by the defend-
ant, at one of which conversations the defendant handed to
the complainant a bundle of papers, which he said contained

information upon which the complainant could ascertain the value of the said interest. But upon examination of the said papers the complainant was unable to gather therefrom any adequate information without the aid and explanation of the defendant, and thereupon the complainant, knowing that the defendant well knew all the facts and reposing that confidence in him which the association of many years of professional and business relation had created (besides being entitled, as the partner of him, the said defendant, to be put in possession of all the knowledge which the defendant had acquired in the prosecution of their joint business), requested the defendant to inform the complainant, first, as to the amount due the firm on account of fees which were earned in said inspectors' cases and for which appropriations had been made by Congress; and, second, the amount of claims not then appropriated for by Congress. And the defendant then and there stated to the complainant that the amount of fees earned and payment of which was already provided for by act of Congress was but the sum of twenty thousand dollars ($20,000.00), and the amount of all other claims of said inspectors' cases not then appropriated for would be about eighty thousand dollars ($80,000.00), in which said last-mentioned cases the expected fees to accrue to the firm would be about twenty thousand dollars ($20,000.00).

"And this complainant avers that relying on the deliberate statement of his said partner, the defendant, in relation to this branch of their joint business which had been within the defendant's exclusive control, as aforesaid, for so long a time he, the complainant, returned the said papers to the defendant, and stated to him that he would be willing to accept defendant's offer and to assign and receive as and for his interest in the fees in all of said cases as follows, that is to say, of the twenty thousand dollars in fees already within the congressional appropriation, one-half thereof, to wit, the sum of ten thousand dollars ($10,000.00) and for the remaining cases (unappropriated for) the further sum of five

thousand dollars ($5,000.00) or in all the sum of fifteen thousand dollars ($15,000.00), which offer complainant was induced to accept solely by means of the said representations of the said defendant. The defendant thereupon drew up in writing a paper purporting to be an assignment by the complainant to the said defendant of the complainant's interest in said cases for the said sum of fifteen thousand dollars, and the complainant thereupon signed and executed the said paper and delivered the same to the defendant, but the complainant not having kept a copy thereof cannot set forth the same in words and figures, and although he has repeatedly asked the defendant for a copy of the same the defendant hath hitherto wholly neglected and refused to comply with the reasonable request of the complainant in regard thereto. The defendant thereupon gave the complainant a check for $15,000.00, which was duly paid.

" 7. And the complainant further shows that at the time of his inquiry of the said defendant as aforesaid, and when the assignment was made as aforesaid, instead of there being, as represented by defendant, but twenty thousand dollars ($20,000.00) of fees in the cases in which there had been appropriations made by Congress as aforesaid, as complainant afterward discovered, more than thirty-two thousand dollars ($32,000.00) of such fees so earned, and of which the greater portion had already been collected by the defendant, and in which the share of this complainant, as an equal partner with the defendant, was one-half, or more than sixteen thousand dollars ($16,000.00), and the complainant therefore avers that the representation of the said defendant in regard thereto was false, untrue and misleading, and tended to the manifest injury, wrong and prejudice of the complainant in the premises. And the complainant further shows that instead of there being only eighty thousand dollars of claims in cases where no congressional appropriation had been made, there were more than two hundred and seventy-five thousand dollars of such claims, and although

complainant does not aver that the said defendant knew the exact and full extent of the claims unappropriated for at the time he made the representations in regard thereto, yet he believes, and therefore avers the fact to be, that the defendant well knew that he was largely understating the amount thereof when he stated the same to be eighty thousand dollars, and well knew that the complainant relied upon the truth of said statement as a basis of the agreement which resulted in said assignment.

" 8. And the complainant avers that he was by the wrongful act of the defendant in the premises and by means of the said untrue, false and misleading representations as to the amount of said fees, induced to execute said paperwriting purporting to be an assignment of the complainant's interest in said inspectors' cases, and he therefore says that the defendant holds the said assignment against equity and good conscience, and that the same ought to be regarded as null and void and of no effect whatever, and the complainant of right is entitled to an equal division, not only of said thirty-two thousand dollars ($32,000), but also of such fees as the said defendant has received out of the claims subsequently collected, and that the complainant is entitled to an accounting as if said assignment had not been executed.

" 9. And the complainant further shows, that although his suspicions were aroused soon after executing the said assignment, as to whether the said defendant had dealt with him fairly in the matter of said inspector cases, it was not until about the 1st of August, 1889, that the complainant ascertained that the defendant had misrepresented the amount of fees earned and to be earned in said cases, when he executed the said assignment, and thereupon he immediately informed the defendant of his discovery and demanded that the defendant should account to him in respect thereto, but that the defendant has hitherto wholly refused so to do, and complainant states that upon a full and complete accounting between the complainant and defendant under the direction

of this court in respect of said partnership matters, the defendant would be found largely indebted to complainant.

" 10. And the complainant further shows that on the 19th day of December, 1889, the said defendant commenced an action of *assumpsit* upon the common counts against the complainant on the law side of this court, demanding the sum of $2,712.81 and interest from the 31st day of July, 1889, and appended to his declaration a bill of particulars of his claim, which said declaration and bill of particulars the complainant makes a part hereof, and prays leave to read on the hearing of this cause as often as occasion may require. And complainant avers that all of the items in the said bill of particulars originate in and grow out of the partnership dealings of the parties, and not otherwise, and that the said items do not constitute a full adjustment of the rights of this complainant and the said defendant, and that only by a full, proper, and complete accounting and discovery under the order and direction of a court of equity could a proper adjustment be had of the rights and equities of the complainant and defendant growing out of their partnership dealings. That the said suit at law is not yet at issue, but that the time for pleading thereto has nearly approached, and that the complainant cannot under the rules of pleading at law incorporate in his plea the equitable defences herein set forth, and which in a court of equity would prevail against the defendant's demand, and especially is the equitable right of the complainant to have discovery in the premises and to have the said assignment cancelled and held for nought as matter not cognizable by a court of law, and if the defendant were, therefore, permitted to prosecute his said suit at law against complainant this complainant would be deprived of his defences to said suit now pending as aforesaid, and that the complainant is therefore entitled to have the defendant enjoined from prosecuting his said suit at law and to have this court order and direct a full and complete accounting between complainant

and defendant in respect of their partnership dealings as aforesaid.

" Wherefore complainant prays as follows :

" 1. That subpœna may issue according to the usages of this court, requiring the defendant to answer without oath the exigency of this bill of complaint, the complainant hereby expressly waiving an answer under oath, and particularly that the defendant shall therein full, true, and perfect answer make to the following interrogatories :

"First. State the exact amount of said claims for inspectors of customs, giving the names of the claimants and the amounts due to each, which had been prosecuted by the firm of Cummings & Baker up to the time of making the assignment mentioned in the bill of complaint, and in which the fees had been received by said firm or either member thereof, and for which appropriation had been made by Congress prior to the making of said assignment. Also state the amount of fees received in each of said cases.

" Second. State the exact amount of claims which the defendant has since said assignment prosecuted to appropriation or payment and give details, showing the amount thereof, the dates of payment, and the amount received in each case, and when received.

" 2. That the said assignment be declared null and void and be held for nought, and that the defendant be directed to surrender the same for cancellation.

"3. That the defendant may be enjoined from the further prosecution of said suit at law begun in the Supreme Court of the District of Columbia on the 19th day of December, 1889, and numbered on the docket of said court as law No. 30,197, pending this cause, and that upon final hearing the injunction may be made perpetual.

" 4. That a full and complete account may be had under the order and direction of this court beween the complainant and defendant in respect of the said partnership dealings, and the defendant be decreed to pay to complainant

the amount which may be found to be due him, and for a full and complete discovery as to all matters herein set forth.

" 5. That the complainant may have such other and further relief as to the court may seem just.

"HORACE S. CUMMINGS.

" The defendant to this bill of complaint is Henry M. Baker.

" FRANKLIN H. MACKEY,

" A. G. SAFFORD,

" *Solicitors for Complainant.*

" I, Horace S. Cummings, do solemnly swear that I have read the foregoing bill of complaint by me subscribed, and that I know the contents thereof, and that the facts therein stated upon my personal knowledge are true; and those stated upon information and belief I believe to be true.

" HORACE S. CUMMINGS.

" Subscribed and sworn to before me this 31st day of January, A. D. 1890.

[SEAL]                    "ROB'T V. HUGHES,

" *Notary Public.*"

The answer, filed February 10, 1890, was as follows:

"The answer of the defendant, Henry M. Baker, to the bill of complaint of Horace S. Cummings in chancery exhibited:

" This defendant saving and reserving all exceptions to the manifold errors in said bill contained, and answering so much thereof as he is advised it is material and necessary for him to answer, answering says:

" 1. Answering paragraph one of said bill, this defendant says that he will not avail himself of the permission accorded by the bill to answer without oath, but will answer said bill as though required to do so under oath.

"This defendant admits the averments of paragraph one of said bill.

" 2. Answering paragraph two of said bill, this defendant says that he is a citizen of the United States, sojourning in

the city of Washington, District of Columbia, for business purposes, but that his domicile is in the State of New Hampshire.

"3. Answering the third paragraph of said bill, this defendant says that the averments thereof are true as to the defendant, but this defendant states, upon information and belief, that the complainant is not a member of the bar of the Supreme Court of the District of Columbia, or of the Supreme Court of the United States, or of any other legal tribunal in said District, except the United States Court of Claims, and that from September 1, 1884, to August 31, 1889, he, the complainant, never made a motion or argued a case in that court while in session.

"4. This defendant, answering the fourth paragraph of said bill, says: This defendant denies most positively the allegations in said paragraph as set forth, but avers the truth to be that the complainant and defendant did enter into a parol agreement for a limited partnership on or about the 1st day of July, 1874.

"That prior to that date the complainant mentioned to this defendant that he, complainant, had heard that the defendant intended to open a law office in said city of Washington, and as the result of the conversation then had and on other occasions soon thereafter, both complainant and defendant agreed to open a law office together; that the complainant then had his office at the northwest corner of F and 12th streets, N. W., in the said city of Washington, over a liquor saloon; that the defendant refused to occupy that office, and as a result the offices were opened at 1411 F street, N. W., in said city, which office the defendant now occupies, were rented, and complainant and defendant occupied them about the 15th of September, 1874, putting up firm signs, having firm letter heads, firm cards, firm blanks, etc., all under the firm name and style of 'Cummings & Baker;' that their agreement was in parol; that the defendant suggested a written agreement to be duly executed,

but complainant said it was wholly unnecessary, and in consequence thereof none was executed ; that by their said parol agreement each was to devote his whole time, atten- tion, abilities, etc., to the practice of the law in Government cases only, and that all of the fees so earned were to be divided equally between them with the single exception, to wit, that the complainant was to have the entire fees aris- ing from the cases the complainant then had on file or there adjudicated, but not settled.    The defendant attaches to this answer an original lithographed letter issued at its date and mailed, to the number of about two hundred and fifty, to persons believed to have legal claims against the United States.    The said letter shows the letter head first used and issued by the said firm in September, 1874.    The said letter is marked Exhibit A and made a part of this answer and prays to be read at the hearing ; that said copartnership, with the modifications and exceptions hereinafter stated, continued until on or about the first day of September, 1889.    This defendant denies that there was any change in their partnership agreements on or about the first day of January, 1876, as complainant avers, or that there was any change whatever then or at or about that time.

"5.  Answering the fifth paragraph of said bill, this defend- ant says that under the said partnership as stated herein, the complainant and the defendant continued to transact their professional business on joint account, with the excep- tion of the complainant's unfinished business, as hereinafter stated, until on or about the —— day of September, 1886, when the defendant became sole owner of one branch of the business theretofore conducted in the joint account, as will be more fully stated in answer to the subsequent paragraphs of this bill of complaint.    This defendant unequivocally denies that part of said paragraph five, wherein the com- plainant so complaisantly avers that he ' faithfully fulfilled all the obligations of his partnership agreement,' and asserts that in the years 1880, 1881, 1882, 1883, 1884, 1885 and

4 Ct. App.—16

1886, the complainant became more and more neglectful of the interests of the partnership business, and seemed manifestly to lose his interest therein. So far as rendering any personal service was concerned, this defendant was compelled to speak to complainant of his lack of service on several occasions, and went so far, in consequence thereof, as to suggest to complainant a dissolution of their partnership relations; complainant objected, and assured the defendant that he, complainant, would in the future attend more closely to the business; that the improvement promised was not realized, except spasmodically; the defendant pointed out to complainant on more than one occasion business which complainant ought to secure, and which complainant promised he would attempt to obtain, but made no well-sustained effort to obtain; that had complainant done so he could have easily secured cases for and in the Court of Commissioners of Alabama Claims, organized under the act of Congress approved June 5, 1882 (22 Statutes, 98), which would have yielded fully $25,000 in fees; that complainant did not even attempt to secure such business; that all the cases in that court which we had were filed, the testimony taken, and were argued by this defendant, although he was then busy with other firm business, at which he worked more hours in one week than the complainant worked upon the firm business in a month; that the defendant earnestly urged complainant to be admitted to the bar of that court, and offered to move his admission thereto, because he wished complainant to take the testimony in some of the cases pending in that court, but the complainant refused to be so admitted, and thus deliberately kept himself in a position where he could not render that service or any other in that court; that this was only one instance of complainant's neglect, when others might be stated; that during the (about) fifteen years the partnership relations existed, in some form or another, the complainant did not even make a motion in any open court, or attempt to argue a case

therein; that the defendant having all the business he could attend to, the complainant in several instances, without consulting the defendant, engaged other attorneys or agents to attend to his business, and thus not only decreased the influence of the firm, but deprived the defendant of fees to which he was justly entitled. And the defendant, further answering, says that owing to the complainant's neglect and failure to discharge his duties under and by reason of said partnership agreement, he did not, so far as defendant is advised, during the last five years and more of said partnership relation secure fees for his services to a greater amount than about $5,800, which said amount the said complainant has not divided with the defendant, and refusing so to do the defendant hereto has heretofore brought suit against him upon the law side of this court, which suit the complainant by his bill in equity seeks to restrain this defendant from prosecuting. This defendant further says that complainant in explanation of his neglect of business, once informed defendant that he had been endeavoring to work up some 'outside business,' but that it had failed. He did not inform defendant of its nature, and defendant does not know what it was. Defendant further says that in the fall of 1884, H. D. Cooke & Co., bankers, failed and made an assignment to the complainant; that it was then stated that Cooke & Co. were largely indebted to complainant, and complainant stated to defendant that he, complainant, accepted the office of assignee to protect himself; thereupon defendant stated to complainant that the assigneeship was outside of their partnership agreement, and virtually ended it; and then the defendant suggested that it be formally dissolved. Complainant replied that he did not think it would take much of his time, and that he would divide his fees as such assignee the same as though the fees were secured in the practice of the law. This defendant was not satisfied, but upon the earnest entreaty of complainant the defendant consented to make a trial of

the matter. From that time until the end of the partnership relations, above five years, complainant did very little law or claim business. Complainant's neglect became so unbearable that in the early part of 1886 defendant informed complainant that he wished to close the partnership relations existing between them, and proposed to complainant that they settle to date all receipts and expenses; that each take as his own all unfinished business taken since the first day of January, 1885, and divide all fees in business taken before that date, as they should be collected, each to retain and manage the business each then had in hand. To this proposition the complainant did not consent, but proposed to divide the business on the first of January,. 1886, instead of 1885, if we must close; or he said in consideration of the greater services rendered by defendant, if he, the defendant, would continue with complainant he would consent to take one-third instead of one-half of the fees collected in the class of cases called in paragraph six of the bill 'inspectors' cases.' At this stage of the matter the defendant offered to buy all the complainant's right, title and interest in and to the fees in the said 'inspectors' cases,' and offered to pay complainant $14,000 in cash therefor.

"Finally, after the negotiations and preliminaries specifically stated in the answer to paragraph six of the bill, the defendant paid complainant $15,000 and relinquished to complainant all his right to share in the fees derived from the Cooke & Co. assignment for the right to the sole ownership of the fees in the said 'inspectors' cases,' and upon these terms the defendant consented that the partnership relations, as thus modified, might for the present continue. The partnership as thus modified continued until about the 1st of September, 1889.

"6. Answering the sixth paragraph of said bill, the defendant says that each and every of the allegations averred in this paragraph are without the semblance of truth, and are

unqualifiedly false, unless in some way these averments are modified by the following facts : ' The course of procedure' in the so-called ' inspectors' cases ' is very inaccurately and insufficiently stated by the complainant, and that the complainant well knows such to be the fact, and the defendant believes that such statement was purposely and intentionally made to the prejudice of the rights and interest of the defendant; that the so-called 'inspectors' cases' involved no less than six distinct propositions of law, dividing those cases into as many distinct classes, and that there were disputed questions of law and fact in many of the individual cases in each class. That to win those cases the defendant filed briefs, or made oral arguments or both, before the Secretary of the Treasury, the Solicitor of the Treasury, the First Auditor, the Commissioner of Customs, the Attorney General, the House and Senate Appropriation Committees and the Court of Claims (20 C. C. R. 115); that in some [form] these cases were before those officers and tribunals, and before some of them the defendant appeared frequently, and before the Auditor and Commissioner of Customs for months together almost daily. This defendant further avers that his knowledge of these cases was derived solely from his study and work ; that complainant could have had an equal knowledge of them in the same way, and that frequently defendant asked complainant to render services in connection with them; and that more frequently than otherwise the complainant neglected to do so. This defendant says that at all times the complainant, prior to his sale to the defendant of all his right, title and interest in said " inspectors' cases," had full and free access to and use of all the agreements, books, papers, records and all other memoranda, which pertained to, or in any manner had any connection with those cases ; and that if the complainant did not avail himself of the opportunities that surrounded him in regard to them, he is alone to blame, and any attempt to censure anyone else comes with a very bad grace from the complainant, having

within his knowledge the truth of the facts herein set forth by the defendant.

" The defendant further says that when he offered the complainant $14,000 for all of complainant's right, title and interest in and to the so-called ' inspectors' cases ' as stated in answer to the fifth paragraph of said bill, complainant considered that offer favorably, and the defendant then gathered together the books of fee agreements, a prepared list showing in what cases the fees were less than twenty-five per cent. of the amount secured ; a list of all the cases allowed and not paid ; a list of the pending cases ; a list of the suspended pending cases ; a partial list of the cases in which the fees were to be divided with other attorneys, and a list of the cases known to the defendant, which were not secured by any attorney, and which might or might not be secured by the defendant or others ; and the Treasury Department Registers of 1874, 1875, 1877, 1879, and 1883 were delivered to complainant by the defendant with the remark that the defendant would tell him anything in regard to them or answer any question in regard to them which he, the complainant, might ask. At the same time the defendant had in his possession, and had had for from two to six months, House Executive Documents of the first session of the 49th Congress, numbered 70 and 225, showing the whole amount of the allowances in favor of the inspectors, and at the time the said complainant took the books and papers herein stated he, the complainant, well knew that appropriation had been made by Congress to pay all of said ' inspectors' cases ' enumerated in said executive documents.

"All of the said books, papers, and documents are herewith submitted for the inspection of this honorable court.

" The defendant further says that these books, papers, and documents were all the books, papers, and documents, except the Statutes of the United States, which the defendant used to ascertain the nature and amount of the ' inspec-

tors' cases,' and that they were full and ample for that purpose and were full and ample to enable the complainant to obtain an accurate and sufficient knowledge of the extent and value of the said 'inspectors' cases.' The defendant further says that complainant took the said books and papers away from the office and retained them in his possession for more than two weeks, and the defendant believes complainant had them at his residence. Complainant then returned them to the office. The defendant further says that he then and at all times prior to the consummation of the sale herein stated made full and complete and correct answers to all the questions asked of him by the complainant of and concerning said books and papers, as well as all facts concerning the 'inspectors' cases,' to the best of his then knowledge and information. At this time complainant had offered to take one-third instead of one-half of the fees in the 'inspectors' cases,' and upon that basis the bargain and sale of his rights to fees in said cases was made.

"The defendant further says that complainant was not ignorant of the amount of fees resulting from those cases, as he had occasionally divided those fees with him ever since 1877 ; and that in the year 1885 defendant paid to the complainant $18,000 as his share of such fees collected in that year.

" The defendant further says he never offered to pay complainant more than $14,000 for complainant's interest in the said cases, but that a few mornings after the return of the books and papers aforesaid by the complainant the complainant said to the defendant, ' I have been thinking the matter over, and if you think it best for me and you will pay me $15,000, I will sell out to you.' The defendant then and there refused to advise him, but offered to answer any questions of fact complainant wished or desired to ask, and then said, ' I think it is more than I ought to pay ; but to end the matter I will give it, if you wish.' The complainant said he would take it, and the sale was then

and there consummated by the defendant giving complainant his, defendant's, check for $15,000, payable to the order of said complainant, and verbally relinquishing to complainant all right of the defendant to share in the fees or to be derived from the assigneeship of H. D. Cooke & Co., held by the complainant, and the complainant then signed the following paper :

"Washington, D. C., Sept. 6th, 1886.

"Received of Henry M. Baker fifteen thousand ($15,000) dollars in full for all interest in and right to fees in the so-called inspector cases. This includes all cases in which fees have not been divided and settled, except one draft to the order of John C. Long, and one to the order of James Mitchell, both dated in 1875, whether paid or unpaid, filed, or outstanding.

"(Signed)    H. S. Cummings.

the original of which will be offered in evidence at the proper time.

"This defendant, further answering, says he does not know positively, but he verily believes that his share of the assigneeship fees would have been, if honestly accounted for, not less than $5,000, so that the entire compensation paid the complainant by the defendant was really not less than $20,000. This defendant, further answering, says :

"That he has no doubt that the complainant fully and well knew the amount of the allowances for which appropriation had been made and knew it when he offered to take the $15,000 as above stated. If he did not know it, it was because the complainant did not make a simple arithmetical computation which any grammar-school scholar of medium attainments could easily make.

"This defendant, further answering, says most emphatically and especially denies that complainant ever asked defendant as alleged the amount of fees earned in those cases for which appropriation had been made, and without reservation pronounces complainant's allegation that de-

fendant stated to complainant that such fees were but the sum of $20,000 to be wholly and entirely false. This defendant further says that he informed the complainant which of the cases reported in the House executive documents as aforesaid were not theirs, and that the list of fees in each case, when other than twenty-five per cent., gave the complainant all the information needed to determine the gross fees to be received; that the defendant also informed complainant in what cases and to what extent those fees were to be divided with other attorneys; and defendant has no reason to doubt that complainant at that time made the necessary computation to determine the fees to be thus received, which complainant must have known were more than he now alleges defendant said they were. This defendant further denies, most positively, that he ever stated to the complainant that the remaining cases would amount to about eighty thousand dollars. This defendant had made no computation relative thereto, and could not have so stated. This defendant further positively denies that the complainant has ever, from the date and delivery of the receipt signed by the complainant, and by complainant called an assignment, asked defendant for an examination, or a copy of it, and defendant says that had complainant done so, he, defendant, should have gladly shown it to complainant, or furnished complainant with a copy of it. This defendant further says that without request, some two months ago defendant voluntarily showed the said receipt to the complainant's senior solicitor.

" 7. In answer to the seventh paragraph of said bill, the defendant says that there is not an allegation in this paragraph which is true, and they are absolutely false.

That when the complainant stated that he, complainant, was entitled to more than sixteen thousand dollars of the fees in the cases appropriated for at the time of the said bargain and sale, that he, complainant, said that which complainant had every opportunity and reason to know was

false, and when complainant stated 'that the representation of the said defendant in regard thereto was false and misleading, and tended to the manifest injury and great wrong and prejudice of the complainant in the premises,' he, the said complainant, deliberately stated that which complainant knew well was false and in every particular untrue; and defendant says said averment is wholly and absolutely false. This defendant further says that he, defendant, absolutely avers that he, defendant, never made the statements, nor the substance of such statements as averred relative to the amount of the value of the remaining cases, and emphatically denies that the complainant relied upon or could have relied thereon.

" 8. Answering the eighth paragraph of said bill, this defendant absolutely and unequivocally denies each and every allegation averred therein.

" 9. Answering the ninth paragraph of said bill, this defendant denies fully, positively and absolutely that he, defendant, did not deal fairly with the complainant in the matter of said 'inspector cases.' As hereinbefore stated, the defendant furnished the complainant with all needed data, and all the data and information which existed, in the office or out of the office within his control in regard to the cases, that was within the knowledge and possession of the defendant, more than two weeks before the bargain, purchase and sale to the complainant, by which sale the defendant became the sole owner of the attorneyship and the fees in those cases. The defendant, further answering, says that he, the defendant, had no doubt at the time of said sale, and has no reason to have any doubt now, but that the complainant, at that time, knew and fully understood the whole matter and the effect of his act as fully and completely as this defendant then knew the same, or as any one could know it prior to the final adjudication of the pending cases. This defendant, further answering, says that within three days from the said bargain and sale

aforesaid he, the defendant, left the city of Washington for a few weeks, and complainant accommodated the defendant by attending to the payment of a few of defendant's clients, for whom the money awarded them was ready, but who had not forwarded to defendant their powers of attorney, to enable defendant to endorse the drafts issued to their orders, deduct the fees due, and to remit the clients the balance. To enable the complainant to do this, the defendant left with the complainant some twelve or fifteen checks on defendant's bank, drawn to the order of the complainant with the date and amounts thereof left blank, and were signed by this defendant as maker thereof; that complainant then, in the absence of this defendant, cancelled the check for $15,000 issued and delivered to complainant by the defendant for the bargain and sale of the cases aforesaid; and from the blank checks hereinbefore described, left with complainant to fill up and pay the clients aforesaid, he, the complainant, took three of the said blank checks and filled them up in his own handwriting, each for the sum of $5,000, and respectively dated September 7, 15, and 29, 1886, which said checks will be produced at the proper time. The defendant further says that he, the defendant, left with the complainant six sheets of schedules upon which were entered the names of all the clients entitled to payment from the appropriation then payable, and which were included in the aforesaid House Executive Documents Nos. 70 and 225, and which are the cases referred to by complainant as the cases for which appropriation was made when the aforesaid bargain and sale took place; that the said schedules contained an accurate statement of the amount allowed each of said clients, the amount of fee due from each, and the amount to which each client was entitled after the deductions of the fee the client had agreed to pay, and that defendant also left with complainant sheet No. 7, which showed the remittances made by the defendant to associate attorneys. This defendant, further answering,

says that the complainant while thus acting for defendant made collections and remittances, as is shown by complainant's own handwriting on said schedule, on the 9th and 29th of September, 1886, and on days intervening between those dates; that the defendant was absent from this city all of the time between those dates, and that the complainant had during all of that time the sole possession and custody of said schedules, which showed the entire fees resulting from the said cases then appropriated for and payable as aforesaid. This defendant, further answering, says that upon defendant's return to this city, complainant returned to this defendant said schedules, defendant's bank book, unused checks, etc., and did not in any manner express to defendant any dissatisfaction with complainant's said sale to the defendant, which sale the complainant had on three separate times ratified by the three separate checks issued by complainant to his own order as aforesaid at dates twenty days apart, during all of which time the complainant had in his possession the said schedules showing the fees as aforesaid, as above stated. This defendant, further answering, says that as time ran on defendant had earned other fees in other cases, in which complainant was entitled to share; that some of those fees were collected by complainant, and some by the defendant, and that the office expenses had been paid in part by each, but to a greater extent by this defendant; that there were other matters between complainant and defendant which should be settled, and that defendant from time to time earnestly tried to secure such settlement, and complainant as earnestly tried to postpone it; that the only reason complainant ever gave to defendant for his, complainant's, unwillingness to have such settlement was that complainant thought that he, complainant, owed defendant money; that complainant gave that as a reason to defendant in the year 1887; that thus matters continued until about the first day of August, 1889, when the defendant informed complainant that there must be a

settlement, and that defendant intended upon such settlement to dissolve their partnership relations. It was then for the first time that complainant expressed to this defendant any apparent dissatisfaction with the sale of September, 1886, and then first having shown to defendant a paper dated September 7, 1886, entitled 'Thoughts in mind for the last few days,' which complainant said he wrote at the time it bears date. This defendant says that when defendant had read it he, the defendant, denounced complainant for having such a paper in his possession for about three years, and during that entire time occupying the same office with the defendant, the party upon whom the said paper is intended to reflect, and never deeming the matter of such sufficient importance as to mention it or show it to the defendant. The defendant, further answering, says that this defendant asked permission of the complainant to take a copy of said paper, which permission was granted and a true copy was made, which this defendant retains, and has now in his possession, and prays may be read as a part of this answer, if the complainant shall fail to produce the original paper, as has been called for. The defendant, further answering, says that the defendant wrote the complainant in reply to said paper, and that complainant's attorney has been duly notified to produce at the hearing said two papers, the original and the reply thereto of the defendant, and if not produced defendant prays to be allowed to read the copies thereof at the hearing of this cause.

" 10. Answering the tenth paragraph of said bill, this defendant most positively denies that all of the items in his particulars of demand attached to defendant's action of *assumpsit* brought against the complainant originated or in any manner grew out of or were a part of the partnership dealings of the parties hereto, and emphatically and unequivocally avers that several of the said items therein stated were entirely of and for an individual and personal character, and that the items thereof of the partnership

origin are based upon an account stated, and so far as this defendant knows the complainant does not deny said bill of particulars. Further answering said paragraph of said bill this defendant positively avers that the items in said particulars of demand attached to the said action at law do constitute a full adjustment of all the rights of this defendant and of the complainant, and which were all duly and properly ascertained by an accounting between the complainant and the defendant, and the result of said accounting was the stated account attached to said action at law, and which said stated account was intended at the time to be a full, complete and final adjustment of the business theretofore existing between the parties; that complainant well knew and fully understood every item that entered into and made up said particulars of demand; that the original account, of which the particulars of demand aforesaid is a copy, is now in the possession of this defendant, and said stated account shows some of the items in said stated account are in the handwriting of the complainant, in which complainant wrote down, at the time of accounting, in the first adjustment and stated account. That account stated was intended by all the parties to be a final statement with a balance struck, as ascertained, and nothing was left for future adjustment or to account for, and certainly no doubt can, for one moment, be entertained to the contrary. And this defendant says there are no equitable rights of the complainant outstanding that need discovery as all the rights of the respective parties were duly considered at the time the parties hereto reached a final statement of the account sued on at law; that there remains no secret or hidden facts that were not known to the complainant when he, the complainant, took part in making up the account stated, and nothing to discover that was not discovered and open to the complainant at that time; that the complainant has a full and complete defense at law, if he has any defense at all, which this defendant avers that com-

plainant has not; but defendant avers that this bill is filed with a view to delay the suit at law, in the hope that some compromise may be effected.

" This defendant is advised that complainant wholly failed to set forth in his said bill any fact wherein and whereby fraud or mistake or accident or error on the part of the defendant can be predicated of, and hence he prays the benefit of this answer as a demurrer as if he had specially demurred thereto.

" This defendant further answering said bill says, that he cannot make an accurate statement showing the amount of fees collected or defendant's just and proper expenses in the prosecution of said cases, because, after the bargain and sale and the payment of the money for said purchase to the complainant of September 6, 1886, defendant never kept an account of such receipts, only as is shown by remittances to clients and others, which is wholly negative, and no account whatever of defendant's personal or other expenses in said inspector cases have been kept. Such expenses, however, amounted to thousands of dollars, but this defendant could not render an account of them, because he has never had any account or memorandum of them, and the complainant well knows the truth of this statement. Being the owner of said cases this defendant was not to account to anyone for them. This defendant very reluctantly says the filing of this bill is an attempt on the part of the complainant to unjustly and wickedly obtain the money, by legal process, which belongs to the defendant, by reason of the fair and solemn agreement signed by the complainant, under the full light of every material fact then existing, and free and clear from any misrepresentation on the part of the defendant. This defendant feels very confident in his own mind, and therefore avers that if the complainant, for one moment, entertained the belief that this defendant could show such expenses in connection with the cases aforesaid, the complainant would not have brought this

case. This defendant further answering says, it is an undeniable fact, that all the complainant had to do, at any time during the twenty days that complainant had the pay schedules in his possession, to ascertain the gross fees was to add up six short columns of figures; the entries on page 7 showed the remittances to the other attorneys in the cases. And defendant very respectfully submits, in the light of the averments charged in the bill, that complainant did do so.

" This defendant, further answering, says this is an attempt on behalf of the complainant, after the lapse of more than three years, with the full knowledge of all the facts, to attack said sale as void; the claim here made by complainant is old and stale, and such as is not favored in equity; and especially ought such demands as this be frowned down by equity after the lapse of this period of time, and during the whole period and over of three years the complainant has not said nor made any effort against the *bona fides* of said transaction; and the defendant here pleads the statute of limitations in his behalf; that said claim did not accrue, nor was any demand made to show error or otherwise by complainant to defendant within the period of three years.

" This defendant says that the complainant has made no assault upon the account stated; that he has no defense to make thereto, but his object is to set aside another and independent transaction, that was especially made over three years ago, and did not enter into or cut any figure at the date of the dissolution of the partnership, and at the time of the stated account, which said stated account was a final termination of said partnership, and the complainant opened an office in another building, and going into business on his own account.

" This defendant says the injunction prayed for should not be granted, and the bill dismissed, etc.

" HENRY M. BAKER.

" Sworn and subscribed to before me this 10th day of February, 1890.

" WILLIAM K. ELLIS,
" *Notary Public.*"

Testimony was taken on behalf of the complainant and the defendant, the substance of which will be found stated in the opinion of the court below.

*Mr. A. S. Worthington* and *Mr. S. R. Bond* for the appellant:

1. The bill does not, upon its face, allege a state of facts entitling complainant to relief.

The settlement sought to be set aside occurred September 6, 1886, and the bill was not filed until February 1, 1890, long after the expiration of the statutory limitation for an action at law. No sufficient explanation or excuse for this delay is alleged in the bill.

In regard to the necessity of setting forth a sufficient explanation and excuse for not bringing suit within the statutory period for an action at law see *Stearns* v. *Page,* 7 How., 819 ; *Badger* v. *Badger,* 2 Wall. 87 ; *Harwood* v. *RR. Co.,* 17 Wall. 78 ; *Marsh* v. *Whitmore,* 21 Id. 185 : *Godden* v. *Kimmel,* 99 U. S. 201 ; *Wood* v. *Carpenter,* 101 Id. 135 ; *Lansdale* v. *Smith,* 106 U. S. 391 ; *Hammond* v. *Hopkins,* 143 U. S. 224 ; *Felix* v. *Patrick,* 145 Id. 317 ; *Murphy* v. *Kirby,* 3 App. D. C. 207.

2. As to the application of the Statute of Limitations :

Where an action at law would have lain, and the case is not exclusively within the cognizance of a court of equity, the statute of limitations applicable to the action at law will be enforced in a suit in equity. *Kane* v. *Bloodgood,* 7 Johns. Ch. 90. See also *Butler* v. *Johnson,* 111 N. Y. 204 ; *Hovenden* v. *Annesley,* 2 Schoales & Lefroy, 607 ; *Lewis* v. *Marshall,* 5 Pet. 470 ; *Bank* v. *Daniel,* 12 Id. 32 ; *McKnight* v. *Taylor,* 17 Id. 197 ; *New Albany* v. *Burke,* 11 Wall. 96 ; *Godden* v. *Kimmel,* 99 U. S. 201 ; *Norris* v. *Haggin,* 136 Id.

386; *Bank* v. *Dispatch Co.*, 149 Id. 436; *Willard* v. *Wood*, 1 App. D. C. 44.

The Maryland statute of limitations, in force in this District, provides that "all actions of account, contract, or upon the case" shall be brought "within three years ensuing the cause of action and not after." An action of account or an action for deceit, or for money had and received, would have lain in this case, and it is one of concurrent and not of exclusive jurisdiction in equity. *Hewitt* v. *Lewis*, 4 Mackey, 10; *Kane* v. *Bloodgood, ante.* The allegation of fraud in the settlement does not render the case one of exclusive jurisdiction. *Stern* v. *Page*, 7. How. 819.

3. While the question of laches is involved in the discussion of the last two points, and the authorities there cited, it demands a separate and fuller consideration in connection with the testimony in the case at bar.

Courts of equity are strenuous in discountenancing delay in the assertion of equitable as well as legal rights, and are said to apply the statute of limitations if not by its own force yet by analogy to the law, so that all cases not falling within the scope of the statute are controlled by it—1 Pomeroy's Eq. Juris., Secs. 418–19; *Wilhelm* v. *Caylor*, 32 Md. 151; *Hall* v. *Clagett*, 48 Md. 223; *New Albany* v. *Burke*, 11 Wall. 96; *Burke* v. *Smith*, 16 Id. 401; *Brown* v. *County of Buena Vista*, 95 U. S. 157; *Hayward* v. *Nat. Bank*, 96 U. S. 611; *Bank* v. *Dispatch Co.*, 149 U. S. 436; *Hollingsworth* v. *Fry*, 4 Dall. 345 (C. C.); *Cleggs* v. *Edmondson*, 8 DeG. M. & G. 787; *Oil Co.* v. *Marbury*, 91 U. S. 587; *Attwood* v. *Small*, 6 Clark & Finley (H. of L.), 232; *Slaughter* v. *Gerson*, 13 Wall. 383; *Foster* v. *RR. Co.*, 146 U. S. 88; *Johnston* v. *Standard Mining Co.*, 148 Id. 360; *McQuiddy* v. *Ware*, 20 Wall. 14; 1 Beach on Modern Eq. Juris., Sec. 83; and yet he first expressed to the defendant his dissatisfaction in August, 1889.

He says he kept the statute of limitations *pretty well in view.*

It is clear that he never would have filed his bill if the defendant had not, in the fall of 1889, insisted upon a settlement of the firm business, and the payment of the balance due him ; and not even then if the defendant had not brought the suit at law against him for that balance to which he had no defence, and the time to plead to which was close at hand.

He had claimed from the defendant, as an offset, or partial offset, to that balance, compensation for assisting him in the collection of the claims in question, and the defendant had in vain urged him to set a value on those services, and complainant had been willing to call their accounts " square." This is inconsistent with a consciousness on his part of having been defrauded, as is the institution of that suit wholly incompatible with a consciousness on the defendant's part of having perpetrated a fraud.

4. The evidence is insufficient to establish the complainant's case and to entitle him to the relief sought. See *Atlantic Delaine Co.* v. *James,* 94 U. S. 207 ; *Southern Development Co.* v. *Silva,* 125 U. S. 247 ; 2 Pomeroy's Eq., Sec. 892-4 ; *New Albany* v. *Burke,* 11 Wall. 187.

5. The appellee lost his right to rescind the sale by failing to act promptly when he learned the facts, and by thereafter doing things which in law amounted to an affirmance of the sale. When a vendee seeks to rescind a sale on the ground that he was induced to make the purchase by fraudulent representations on the part of the vendor, he must exercise the right of rescission promptly when he learns that he has been deceived. Such a right is to be exercised by the vendee himself, and statutes of limitation regulating the time within which suits shall be brought have no application. *Masson* v. *Bovet,* 1 Denio, 69 ; *Hammond* v. *Pennock,* 61 N. Y. 153 ; *Mattison* v. *Holt,* 45 N. H. 342. And see, to the same effect, *Pierson* v. *Crooks,* 115 N. Y. 539 ; Benjamin on Sales, Sec. 452 ; *Grymes* v. *Sanders,* 93 U. S. 62 ; *McLean* v. *Clapp,* 141 U. S. 432 ; *Twin Lick Oil Co.* v. *Marbury,* 91

U. S. 592; *Hayward* v. *Bank,* 96 U. S. 617; *Scheftel* v. *Hays,* 58 Fed. Rep. 459; *Rugan* v. *Sabin,* 53 Fed. Rep. 418.

*Mr. Franklin H. Mackey* and *Mr. H. O. Claughton* for the appellee.

The opinion of Mr. Justice Hagner, in the court below (adopted by the Court of Appeals and ordered to be filed with the opinion of this court, and in the report of the case to be inserted preceding the opinion of this court adopting the same), is as follows:

This case was submitted at the end of the July term. After a very thorough examination of law and testimony, I prepared a decree which was almost identical with the one I shall now sign. But upon further reflection, finding I was unable to rid myself entirely of doubts upon some of the important questions involved, which had not been particularly argued by counsel, I ordered a reargument upon these points. This, on both sides, has certainly been very exhaustive and able.

I shall not now attempt an elaborate examination either of the law or the facts, but shall endeavor to express my conclusions in the briefest manner consistent with the importance of the case.

*First.* The first question for consideration is whether the bill presents a case calling for equitable relief, assuming its statements to be true.

A careful examination of its averments in the light of the decided cases has satisfied me this question should be answered in the affirmative.

If the transactions therein narrated had taken place between parties holding no relation of trust or confidence towards each other, it may be conceded these conclusions would not be perfectly clear. But this controversy grows out of dealings between copartners, with respect to the common property of the partnership, belonging equally to each; and the universal voice of the equity courts declares that such transactions should be examined with the most careful

scrutiny, and determined according to the strictest principles of the law.

Justice Story states this position in these words:

" Good faith not only requires that every partner should not make any false representations to his partners, but also that he should abstain from all concealments which may be injurious to the partnership business. If, therefore, any partner is guilty of such concealment, and derives a private benefit therefrom, he will be compelled in equity to account therefor to the partnership. Upon the like ground, where one partner, who exclusively superintended the accounts of the concern, had agreed to purchase the share of his copartners in the business for a sum which he knew, from the account in his possession, but which he concealed from them, to be for an inadequate consideration, the bargain was set aside in equity as a constructive fraud, for he could not in fairness deal with the other partners for their share of the profits of the concern without putting them in possession of all the information which he himself had with respect to the state of the account and the value of the concern." Story on Part., Sec 172.

To the same effect is the conclusion of the learned author in 3 Lindley on Partnership (chapter 2, book 3, page 569), who, after a review of all the authorities, holds that between copartners, of all men, there should ever be maintained *uberrima fides*, and that " one who seeks to benefit himself at the expense of his partner must have his conduct tried by the highest standard of honor." Lindley, 771.

Without pausing to refer to the very numerous cases cited by counsel, or to the many others that have come under my observation, I will content myself with quoting from the language of the Supreme Court in 2 Wall. 70; *Brooks* v. *Martin*:

" We lay down, then, as applicable to the case before us, and to others of like character, that in order to maintain such a sale (by one partner to another) it must be made to

appear, first, that the price paid approximates reasonably near to a fair and adequate consideration for the thing purchased; and, second, that all the information in possession of the purchaser, which was necessary to enable the seller to form a sound judgment of the value of what he sold, should have been communicated by the former to the latter."

Tested by these principles, there can be no doubt the bill presents a case which, if sustained by the proof, and found free from other objections, will justify a rescission of the assignment from Cummings to Baker of the 6th of September, 1886, and a decree for an account.

It is true the cancellation of an executed contract is the exercise of one of the highest powers of a court of equity, which should only be exerted upon satisfactory proof; but the cases exhibit repeated instances of the exercise of such an authority. If the court should allow the wrongdoer to retain possession of property obtained from his copartner under circumstances denounced by the principles I have referred to, it would effectively justify the wrong, by taking the side of the wrongdoer.

*Second.* The prayer of the bill in this cause explicitly called on "the defendant to answer without oath"—"expressly waiving an answer under oath." The defendant, nevertheless, with equal explicitness, declined to "avail himself of the permission accorded by the bill to answer without oath;" and his answer is verified in the usual manner.

The defendant insists an answer cannot be deprived of its force as a pleading and evidence accorded by the principles of chancery practice, by such waiver on the part of the complainant; and that his right to the benefit of his sworn answer remains unaffected by any statement of this nature the complainant may see fit to make.

Our Chancery Rule 63, which is similar to the rule of the Supreme Court on the subject, declares that after such waiver by the complainant the answer shall not be evidence in the

defendant's favor unless the cause be set down on bill and answer only; but that it may be used as an affidavit with the same effect as heretofore on motions respecting injunctions, or other incidental motions.

The defendant relies on the remark of Chancellor Walworth, who prepared the law to this effect passed by the legislature of New York, that its establishment was "the adoption of a new principle of law," and he insists a mere rule of court can have no power to deprive him of his previously existing rights in this particular, in the absence of similar legislation by Congress.

Without pausing to recapitulate the points of the contention on both sides, I will content myself with saying that, after full consideration of the arguments, I think our rule was established by competent authority, and that our uniform practice under it since its adoption has been entirely justified.

The answer of defendant, therefore, at this stage of the case, cannot be regarded as evidence, any more than the averments of the bill itself can be so considered.

*Third.* Are the essential averments of the bill sufficiently established by the testimony?

The only witnesses as to the most important of the charges are the complainant and the defendant; for the testimony of Lease and Wilson is of little moment. This evidence is to be considered in connection with the numerous writings and documents referred to by each side, and according to the usual rules for weighing such testimony.

The parties are alike interested in the result; they are members of the same profession; for years they were friends and copartners; they appear to be of equal intelligence and education; and their associations and aims seem to have been similar.

In some few important parts of their testimony they are directly in opposition; but in others, of equal importance, there are such agreements in their evidence as may be said to amount to mutual admissions on the following points:

*a.* That Baker had the principal charge of the Inspector

cases, almost to the exclusion of Cummings; indeed, Baker relies upon this fact as an important reason why he was equitably entitled to a larger share of the profits arising from their prosecution.   He testifies he had done so much more than Cummings that he had become tired of doing all the work for only one-half of the fees.

*b.* That Baker, as the result of this exceptional labor in the cases, had acquired a far greater acquaintance and familiarity with the business than Cummings, and especially of its extent and value.   Baker resents the intimation of Cummings that this constant work about the cases required no great skill or learning, by pointing out the difficulty and important character of the work thus devolved upon him ; some of which, as arguments in court and elsewhere, he insists Cummings was not qualified to perform.

*c.* As a matter of fact, in the distribution of the firm business, the Inspector cases were left to Baker to prosecute and collect the money, and, except in a few instances, to deduct the fee and remit to the claimant.   He insists the discovery of the alteration in the statute was due to him, and that the suggestion to undertake the prosecution of the claims also came from him.

*d.* That Baker began to talk about the dissolution of the partnership early in 1886 ; and that the first suggestion that Cummings should sell his share in the Inspector cases was made by Baker, who insisted there should be a dissolution, unless Cummings would agree to sell out his share.

*e.* They differ as to the statement of Cummings that Baker said the fees already collected and not divided did not exceed $22,000, and that the total amount to be collected on unadjusted claims would not exceed $80,000.   But Baker admits he told Cummings that $15,000 was " more than he ought to pay," and " more than he could afford to pay," for Cummings' entire interest in all the fees present and in anticipation.

*f.* That the fees then actually earned, but not paid over,

amounted to ............................................. $32,971.57
from which was to be deducted fees due to other
    attorneys, amounting to.......................... 1,488.00

leaving the net balance............................. $31,483.57
which would give to each partner................. 15,741.78
or $741 more than the sum Baker said he could not afford
to pay to Cummings in settlement of his half of those fees
then in hand; and it is also proved that the one-half of
the fees to arise from the $275,000.00, the aggregate of the
claims yet to be collected, would amount to about $35,000.00.
Supposing the same proportion (about one twenty-second) of
these fees was payable out of this sum to other attorneys, the
$35,000.00 would be subject to be reduced by about $1,600.00,
leaving the net proceeds from this source $33,340.00; which
would represent the amount, on these figures, Cummings con-
tends he gave away to Baker for nothing, beyond the relin-
quishment by Baker of one-half of whatever he was entitled
to receive from the Cooke estate, which Baker had long be-
fore declared he did not intend to claim.

*g.* That about $128,000.00, deposited at different times at
Corson & McCartney's bank by Baker & Cummings, arose
only out of these Inspector's claims; that it all was placed
to the credit of Baker, and that the claimants, for the most
part, were paid through checks on that fund, which, there-
fore, was practically to be regarded, as to this transaction,
as a partnership account.

*h.* That up to the time of the assignment the most inti-
mate relations existed between the partners, and that Cum-
mings, up to this time, placed implicit faith in the integrity
and friendship of Baker. Cummings' testimony that he
had as much confidence in Baker at the time as any man
living, and that he would have entrusted his entire estate
to him during years of absence out of the country without
hesitation, is quite consistent with his repeated requests to
Baker to advise him as to what sum he thought he ought
to take for his half. To none but a most trusted friend

could a man have agreed to submit the naming of the price he ought to receive for the sale of his property to that friend.

*i.* That the $15,000.00 received by Cummings as the entire price of this sale was nearly all paid out of the money Baker had already received for fees then actually due to Cummings; and that within a short time the residue, making up the entire $15,741.78, was realized from money collected by Cummings between the 7th and 29th of September, 1886, and by Baker after his return to the city, all of which went to the same account with Corson & McCartney's bank.

In effect, therefore, every cent Cummings received on the sale came from his own money already earned by him; much the greater part of which Baker ought to have turned over to Cummings before the 6th of September, 1886, when the agreement was signed.

Cummings thus, by the admission of the parties, parted with a property interest of almost $50,000.00 in exchange for $15,000.00, paid to him out of his own money already earned. In view of these established facts, can it be said of this transaction that the first postulate laid down by the Supreme Court as indispensable to maintain a sale of a partner's interest in the partnership estate to his copartner is shown to exist, namely, that it "appears that the price paid approximates reasonably near to a fair and adequate consideration for the thing purchased?"

Is it within the bounds of credibility that Cummings, if he had known the value of what he was asked to assign, could have been stupid enough to have parted with it so needlessly, for so disproportionate a consideration?

*Fourth.* The second condition requisite to maintain in a court of equity a sale by one partner to another, according to the decision in *Brooks* v. *Martin,* is the proof "that all the information in possession of the purchaser which was necessary to enable the seller to form a sound judgment of the

value of what he sold should have been communicated by the former to the latter."

How stands the proof as to this requirement?

The bill charges the proposition that Cummings should sell out his interest in the Inspector cases fees was renewed repeatedly by Baker, who declared that if Cummings did not agree to sell out he would insist upon the immediate dissolution of the firm; that Cummings protested he knew very little about the amount of the claims, or of the probable fees, and was, therefore, really ignorant as to what his interest was worth; that he called more than once upon Baker to give him the information he needed, and begged him to advise him as to what he ought to do with respect to the sale.

It further avers that " at one of those conversations the defendant handed to the complainant a bundle of papers which he said contained information upon which the complainant could ascertain the value of the said interest, but upon examination of said papers the complainant was unable to gather therefrom any adequate information without the aid and explanation of the defendant; and thereupon the complainant, knowing that the defendant well knew all the facts, and reposing that confidence in him which the association of many years of professional and business relations had created (besides being entitled, as the partner of him, the said defendant, to be put in possession of all the knowledge which the defendant had acquired in the prosecution of their joint business), requested the defendant to inform the complainant, first, as to the amount due the firm on account of fees which were earned in said Inspectors cases, and for which appropriation had been made by Congress; and, second, the amount of claims not then appropriated for by Congress. And the defendant then and there stated to the complainant that the amount of fees earned, and payment for which was already provided for by act of Congress, was but the sum of twenty thousand dollars ($20,000.00), and the amount of all other claims of

said Inspectors cases, not then appropriated for, would be about $80,000.00, in which said last mentioned cases the expected fee to accrue to the firm would be about $20,000."

"And this complainant avers that, relying on the deliberate statement of his said partner, the defendant, in relation to this branch of their business, which had been within the defendant's exclusive control, as aforesaid, for so long a time, he, the complainant, returned the said papers to the defendant, and stated to him that he would be willing to accept defendant's offer and to assign and receive as and for his interest in fees in all of said cases as follows : That is to say, of twenty thousand dollars of fees already within the Congressional appropriation, one-half thereof, to wit, the sum of ten thousand dollars ($10,000.00), and for the remaining cases (unappropriated for) the further sum of five thousand dollars ($5,000.00), or in all the sum of fifteen thousand dollars ($15,000.00), which offer complainant was induced to accept solely by means of the said representations of the said defendant."

To these averments Baker replies that on the occasion referred to he gathered together and gave Cummings the various papers enumerated on page 16 of the record, stating to him that any information requisite to their full comprehension would be furnished him; that Cummings kept these papers for more than two weeks before the assignment was made; that he has no doubt Cummings fully understood everything of importance on the subject at the time; that he dealt with the complainant with perfect fairness, and if Cummings did not understand everything it was his own fault; that when Cummings returned the papers he told defendant he hardly knew what to say, and asked defendant's advice as to what he should do, which he distinctly refused to give, telling him they were trading, and he must rely upon his own judgment; that the next day Cummings came to the office and said he had been thinking over the matter, and if Baker would give him the

$15,000.00 he would trade, to which he replied, "it was more than he could afford to pay," but that, to end the matter and have an end to the whole thing, he would give it to him.

The representations of the two parties are in substantial accord as to the nature of the papers Baker delivered to Cummings, as well as to Baker's omission to show or deliver to him the schedules marked "H. M. B. No. 3."

It is admitted that, for several weeks before the bargain, Baker had been using in the office those schedules, which contained the names of every one of their clients whose claims were comprehended in the last appropriation of Congress, with a memorandum of the amount to which they were each entitled; of the fee due the copartnership in each case, and of the proportion of that fee payable to other attorneys. Under appropriate headings Baker had also noted from time to time, opposite to each name, the date of the receipt of the moneys; of the remittance to each claimant, and the amount sent to each.

It is clear Baker never showed this schedule to Cummings until after the assignment had been executed and delivered to Baker, and the check for $15,000 had been given by him to Cummings. Baker testifies this took place on the 7th of September, just as he was about to leave the city. He then told Cummings that some of the drafts payable under the last appropriation had not yet been collected, and requested him to receive the amounts, deposit them in the bank and make the settlements for them with the claimants, from time to time, until his return to the city. For this purpose he handed Cummings a number of checks he had signed in blank on Corson's Bank, which Cummings was to fill up with the names of the several claimants, as the drafts for their claims should come to hand, and transmit them to the parties entitled. Cummings complied with this request, and from day to day, from the 7th to the 29th of September, filled out the checks in his

own handwriting and sent them to the claimants; noting on the blank spaces left in the schedules the several particulars as to dates and amounts, in the manner Baker had previously done in other cases. On Baker's return Cummings returned him the schedules and Baker proceeded to complete the entries as to the remaining claimants until the paper was complete, as it now appears.

The schedules show that Baker had commenced the entries as early as the 30th of August, and he says he had prepared the schedules before those entries were made. And yet, though he professes to have wished Cummings to understand everything connected with the amount of those claims, and of the fees, he neither delivered to him the schedules nor showed them to him until the 7th of September, when he needed the assistance of Cummings to complete the settlement with the claimants.

It is apparent it would have required considerable research on the part of one unfamiliar with the history of the claims to prepare for such settlement with the claimants if he had only the budget of papers delivered by Baker to rely upon. But the schedules would enable Cummings, without any delay and study, to obtain the knowledge to settle with the claimants, independent of all the other sources of information specified by Baker in his answer, which were already under Cummings' control.

If the other papers first confided to Cummings would have sufficed for this purpose, why did Baker, for the first time, intrust Cummings with the schedule? What tenable reason could be given why the purchasing partner, especially acquainted with these claims, if he had wished Cummings to arrive at an easy understanding of the amount, date, and particulars of the several claims before the assignment, should have refrained from handing those schedules to Cummings with the other papers, or instead of them? Under the circumstances, during the negotiation, hearing the repeated statements of Cummings of his ignorance of

the business, Baker should have volunteered—indeed, insisted—upon showing and explaining the schedules to Cummings, whom he knew was ignorant of the details of the claims, and almost of their general condition.

His refusal to show the schedules to Cummings subsequently, when requested by him, after the dissolution, exhibited a similar disregard of his copartner's rights, and tends to explain his previous conduct.

If the other papers given by Baker to Cummings were adequate in Cummings' hands to a full understanding of the claims, they would have been equally instructive to Baker, and it would have been needless for him to have to prepare the schedules at all. If he prepared the schedules because the undigested mass of books and papers were not adequate in form for ready use by Baker himself, without such an abstract of their contents, which was undoubtedly the fact, then it was clearly his duty to have given the schedule to his copartner, his equal in every right by the terms and law of the partnership, and the co-owner with him of every dollar of the fees present and prospective.

Even if this withholding of the schedules had been only the result of carelessness and lack of appreciation of the importance to a full comprehension by Cummings, the act was a grave omission, and constituted a neglect of a plain duty required of him under the circumstances, that would bar the approbation of the assignment by the court.

His declaration that $15,000 was " all he ought to pay," " or could afford to pay," uttered by one partner to another about a subject with which he was presumably familiar, cannot be regarded merely as the *simplex commendatio* of a seller in an ordinary bargain and sale, even between strangers dealing at arm's length, but must be considered as a distinct assertion of his belief; which, as was said by Judge Story in *Stubbs* v. *Eddy*, 4 Mason, 423, " is an affirmation of a fact, that is, of the fact of belief; and if it is fraudulently made to mislead or cheat another, to abuse

his confidence, or blind his judgment, it is in law and morals just as reprehensible as if any other fact were affirmed for the like purpose. The law looks not to the nature of the fact averred, but to the object and design of the affirmation."

But if it be true that Cummings, by an attentive examination of the papers entrusted to him by Baker before the assignment, might have informed himself fully of the true state of affairs, that fact would not have atoned for any misrepresentations on the part of Baker, which were confided in by Cummings and made the basis of his action. If, as between strangers, a statement of importance relied on by the vendee and controlling his actions, proves to be incorrect, the seller cannot escape the consequences by saying, "What I said was false, but you ought not to have believed me." *Battelle* v. *Dennison*, 21 D. C. 195; *Redgraves* v. *Hine*, 20 Ch. Div. 1.

*A multo fortiori* should this principle apply between partners, since the relations of trust and confidence naturally have a powerful tendency to disarm suspicion?

I have not time to advert to many considerations of importance arising out of the testimony. Among them is the fact that the payment was made by Baker to Cummings out of his own money, deposited with Corson & McCartney, in what was really a copartnership account. A similar circumstance was greatly relied upon in *Helmere* v. *Smith*, 35 Ch. Div. 436, where a partner bought at a sheriff's sale a chattel interest of a copartner in the partnership, and paid for the purchase by a check drawn on the partnership account.

Lindley, the author of the celebrated treatise on partnership, who was one of the justices sitting in the case, said:

"What makes this case particularly easy is this: When the sheriff sold under the *fi. fa.* to the continuing partner, he did not pay the money out of his own monies, but paid for the purchase out of the assets of the partnership."

*Fifth.* It remains to consider whether the delay of the complainant in instituting this action constitutes such laches as should debar him from recovery. The sale was made on the 6th of September, 1886. Cummings testified he did not arrive at the conviction that imposition had been practiced upon him until two years and eleven months afterwards, in August, 1889. The partnership relations between them were then still in existence; but the dissolution took place immediately afterwards, in September, which was fully three years after the sale. It was not until February, 1890, six months after the discovery, and three years and five months after the assignment, that the bill was filed in this case.

It is for the best interests of society that controversies should be adjusted speedily, and the statutes of limitation are framed to compel the enforcement of this principle by courts of law. And courts of equity, which are moved to interfere, as a general rule, only in behalf of those who have not slept on their rights, require the exhibition of proper diligence in their assertion, and will demand a reasonable explanation for any undue delay.

Were these delays unreasonable under the circumstances?

The determination of the question whether the delay in any given case was reasonable, or the reverse, must depend upon its own circumstances. Courts of equity have sustained bills brought after three or four times as long a delay as that appearing here, while in other cases a much shorter interval has been considered as immoderate, and has been sustained as a sufficient defense on the ground of laches.

Cummings admits that soon after he had made the assignment doubts arose in his mind whether he had not been imposed upon; but he swears that his confidence and great reliance upon Baker caused him to silence the expression of those doubts as often as they occurred to him, until August, 1888. He testifies that shortly after he had signed the assignment he reduced to writing his doubts and beliefs in

the paper called "Thoughts and Meditations," which he first showed to Baker nearly three years afterwards and a copy of which has been offered in evidence by the defendant.

The paper would not have been admissible on the offer of Cummings, but was quite competent when introduced by the defendant as a declaration by Cummings.

Its statements are damaging in different particulars to each side. Assuming its statements to be candid and contemporaneous, it is conclusive proof that Cummings entered into the bargain with misgivings of its wisdom; insisting he saw no reason why he should not be equitably entitled to as much of the fees as Baker, and that he thought Baker was acting selfishly in insisting upon the sale as the condition on which the partnership should continue.

On the other hand, it is filled with his asservations that these doubts had yielded to the force of Baker's assurances of the moderate amount of the claims and of the fees the copartnership was likely to realize from them after deducting fees to other attorneys and expenses; that he believed these statements solely because of his implicit belief in Baker's integrity and his confidence in his truth and honor; and that relying upon Baker's deliberate statements, and wholly because of his faith in him, he had concluded to comply with his urgent application, which in view of the threat to dissolve made to a man shown to be then in embarrassed circumstances from his building engagements, might well be considered as an exigent demand, not to be resisted with safety to himself in his business relations.

In this frame of mind he claims to have accepted the situation in good faith, and after he had executed the assignment he proceeded to perform Baker's request to settle with the claimants then unpaid. It is true, he then had in his possession the schedules, and that a proper examination of them would soon have convinced him that Baker had greatly underestimated the amount of the fees already earned. Assuming Cummings confided in Baker's integrity,

as he swears he did, Cummings' statement that he recon-
ciled the discrepancy between the schedule account of fees
and Baker's estimate, to the alleged large deduction to be
made on account of fees payable to other attorneys, appears
to be a sufficient explanation why Cummings did not at
once repudiate the settlement, because of that discrepancy.
The copartnership still continued, although Cummings as-
sumed thenceforth no management of the Inspector cases.
His testimony, supported by the other proofs, shows that
during the session of 1886–'87 no appropriation was made
by Congress respecting the payment of the deferred claims;
and that the first law on the subject was passed on the 1st
of February, 1888 (25 Stats., 28), when an appropriation
was made of $73,226.76 on this account. Up to this date,
therefore, nothing had occurred to put Cummings on in-
quiry as to the correctness of Baker's representation on that
subject. Cummings swears that when this act passed he
observed the sum so appropriated was so near the amount
named by Baker, that assuming it was a full settlement of
all the remaining claims, he accepted it as a verification of
the statement of Baker; and again aided him in the collec-
tion of the money. But after March 30, 1888, he was aston-
ished to find Baker had obtained an allowance of that date
for $62,661.37 in Inspector cases, in one appropriation bill,
and a further allowance of more than $46,000 in another
bill of the same date. He then saw that the deferred claims
thus allowed already exceeded Baker's estimate by at least
$28,000; and when, in October, 1888, a still further appro-
priation of $110,636.64 was made, the doubts and suspi-
cions that had been growing in his mind became so strong
that he began seriously to investigate the entire subject, in-
cluding the amount of the fees involved in the settlement of
September 6, 1886.

I think this explanation, verified as it is by the proofs in
the case, sufficiently accounts for Cummings' delay up to

this point; which accounts for the space of two years after the assignment.

He testifies that he at once entered on those investigations by obtaining from the Treasury all the information requisite to a full understanding of the cases, and this examination continued until late in the spring or early summer of 1889. About the 1st of August, 1889, having conclusively ascertained that the defendant had misrepresented the facts at the time of the contract, he immediately informed him of this discovery and demanded a full accounting. Receiving no satisfactory reply, he wrote him a letter on the 23d of August, 1889, begging replies to what appeared to have been very reasonable inquiries on the subject, and asking for information; to which Baker replied on the next day: "It is none of your business; I bought you out of these claims, horse, foot, dragoons, and all."

Up to this date, August, 1889, there had been no delay that is not satisfactorily explained. The intervening time between that time and February, 1890, when the suit was commenced, was occupied in further researches in the Treasury; in correspondence and interviews with Baker; in arrangements as to the dissolution, which occurred September, 1889; and in discussion of a compromise. The five months thus employed do not constitute an unreasonable delay in bringing the suit after the full conviction on his part of the wrong he had sustained. Ordinarily, no right exists on the part of a partner to demand an account of the partnership affairs until after a dissolution; for while each partner is exercising his own rights and enjoying his share of the property there is no occasion for litigation; and the complaint here is that the agreement that excluded Cummings from his full rights in a part of the copartnership affairs being unjust and void in law, he must be regarded as having been entitled to full participation in all its rights up to the time the partnership relations were actually severed.

There is nothing to show any loss of witnesses or destruction of books or other alteration in the relative positions of the parties caused by the delay to the prejudice of the defendant. His statement that he has no books of account to produce before the auditor does not show that this is the result of the complainant's delay to sue; for it is evident he would have said the same thing if the suit had been brought in October, 1888, if it be true he never had any such books.

If the complainant had slept on his rights so long that great and serious injury would result to the defendant because of the delay, culpable laches might be imputed to him. But almost the entire evidence on the accounting, except that of the parties, will be derived from documentary proofs still in existence and unimpaired.

The court will look with leniency upon delay caused by sincere efforts to induce a compromise and prevent litigation, especially where it appears the complainant's equity was well known to the defendant from the time of the settlement; and a party insisting upon the strict application of the doctrine of laches under such conditions will not be the object of special solicitude of the court. 92 U. S. 101; *Neblett* v. *Macfarland*.

For these reasons I do not think the delays of the complainant are of such a character, and are so free from reasonable explanation, that they can be imputed to him as culpabilities, disenabling him to maintain this suit.

I shall sign a decree annulling the assignment of the 6th of September, 1886, and ordering an account of the partnership affairs, with such limitations, and subject to such allowances to the defendant, as I think are right.

[Endorsed:] This opinion, being adopted by this court, will be filed with the opinion of this court, and, in the report of the case, will be inserted in the report preceding the opinion of this court adopting the same.

The CH. JUSTICE.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case, it appears, was argued and reargued in the court below, and the learned justice who heard the case has given it very full and careful consideration, as is shown by his carefully prepared opinion contained in the record. Both the law and the facts are fully and clearly stated in that opinion, and, upon careful examination of the whole case, we entirely concur both with the reasoning and conclusion of the learned justice.

The only questions that would seem to admit of serious discussion, and which were much discussed in this court, are those in respect to the application of the statute of limitations, and the equitable doctrine of the lapse of time, pleaded and relied upon by the defendant. But those questions have been well considered and satisfactorily disposed of by the court below. Indeed, it may be very much doubted whether any such questions properly arise in the case. It is very clearly shown, that the $15,000 paid over to Cummings by Baker on the assignment of the former's interest in the inspector cases, was not in truth the money of Baker, but was the money of the partnership of Cummings & Baker, deposited in the name of Baker; and that, in receiving the $15,000 as for his share or interest in the inspector cases, Cummings was in reality, and to all intents and purposes, receiving his own money, and not even the full amount due him, for and on account of the inspector cases previously earned, and actually realized or secured. This being so, the assignment of September 6, 1886, was not only voidable for misrepresentation and failure to make full and frank disclosures of the real state of the business, and the extent of the interest of Cummings therein, as held by the court below, but it was void from the commencement, and transferred no interest to Baker, because of the entire want of consideration—the $15,000 being received by Cummings in ignorance of his rights. If this view of the transaction be correct, and we perceive no

reason to doubt it (*Helmore* v. *Smith*, 35 Chan. Div. 436; *Brooks* v. *Martin*, 2 Wall., 85), neither the statute of limitations, nor the doctrine of the lapse of time, as defenses to the relief sought, would have any application. The assignment did not break up or terminate the relation of partners; but the partnership continued not only with reference to the other business of the firm, but also with reference to the inspector cases; the assignment to Baker being without legal effect or operation. And that being so, and the partnership continuing until September, 1889, when it was dissolved, less than five months intervened from the time of dissolution to the time of filing the bill, on the 1st of February, 1890.

However, without insisting upon this view of the case, but treating the assignment as being voidable merely for misrepresentation and non-disclosure of material facts, we are of opinion that the court below was clearly right, and we shall affirm the decree appealed from for the reasons assigned by the learned justice in the court below. In either aspect of the case, the decree for an account was proper, and the basis for stating the account, as prescribed by the decree appealed from, is such as furnishes the appellant no just ground of complaint. The decree is affirmed, with cost to the appellee.

*Decree affirmed, and cause remanded for further proceedings.*